IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN LOYE, et al.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant.<br>_____/ | CASE NO. CV F 10-1581 LJO GSA<br><br>**ORDER ON GOVERNMENT'S F.R.Civ.P. 12(b)(1) MOTION TO DISMISS**<br>(Doc. 19.) |

**INTRODUCTION**

Defendant United States of America ("Government") seeks to dismiss plaintiff Susan Loye's ("Ms. Loye's") personal injuries claims arising from her fall from steps ("steps") at Yosemite National Park ("YNP") as barred by the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. The Government further seeks to dismiss the loss of consortium claim of plaintiff Kenneth Loye ("Mr. Loye"), Ms. Loye's husband, in the absence of Ms. Loye's viable claims. Mr. and Ms. Loye (collectively the "Loyes") contend that construction of the steps failed to implement a policy to comply with building codes to bar the discretionary function exception. This Court considered the Government's F.R.Civ.P. 12(b)(1) motion to dismiss on the record without a hearing, pursuant to Local Rule 230(g). For the reasons discussed below, this Court DISMISSES the Loyes' claims.

# BACKGROUND

## Summary

During the late afternoon of May 23, 2009, Ms. Loye walked up the steps from a viewing area to a parking lot at YNP's Olmsted Point, lost her balance, fell onto rocks adjacent to the steps, and suffered significant injuries. In their Complaint for Damages ("complaint"), the Loyes allege that the steps were negligently constructed and maintained because they lacked handrails or guardrails, have a confusing rise and run, were bordered by jagged boulders, and did not comply with mandatory building requirements. The Loyes further fault the National Park Service's ("NPS'") failure to warn of the steps' risk to visitors. The Government contends that NPS was not subject to building requirements as to the steps and that NPS' design and construction of the steps is subject to FTCA's discretionary function exemption to bar the Loyes' claims.

## Rehabilitation Of Olmsted Point Steps

Olmsted Point is the largest overlook on YNP's Tioga Road, is a popular viewing area, and provides views of YNP's granite landscape, including Half Dome, Cloud's Rest and Tenaya Lake. Olmsted Point includes small parking and viewing areas, which are surrounded by slopes dotted with large boulders. On one side of the viewing area, eight granite steps lead to a short exposed aggregate path to a junction to three trails leading to points of interest. The steps provide access from the parking lot to the viewing area.

In 2005 and 2006, NPS engaged in the Olmsted Point Rehabilitation Project ("rehabilitation project") to rehabilitate and improve the parking and viewing areas because of eroded rock footings in the parking and viewing areas and the non-maintained trail extending to the viewing area. NPS decided to alter the short rock-lined path leading down the slope from the viewing area to the trail junction. The Government explains that the alterations did not change the path's alignment but were designed to accommodate terrain grade changes and to maintain the existing path entrance by constructing eight trail connection steps and replacing interior trail steps with a continuous exposed aggregate surface. The Government notes that NPS chose the rise and run of the steps and omitted a handrail or guardrail to preserve the area's natural terrain and Olmsted Point views. The Loyes characterize the steps as "an integral part" of the rehabilitation project.

1   After its September 2006 completion, YNP Superintendent Mike Tollefson ("Superintendent Tollefson") described the rehabilitation project as "an incredible balance between protecting our natural areas and improving access to one of the most distinctive panoramas in the world."

### Building Codes Requirements

The Loyes note that Superintendent Tollefson made "a policy decision" that the rehabilitation project "comply with applicable building codes." The Loyes point to the rehabilitation project's Project Manual and Specifications ("bid set"), which were published on July 15, 2005 and sent to all contractors who wished to bid on the rehabilitation project. The bid set's section 1.14 addresses "Regulatory Requirements" and states:

> The codes and regulations together with local amendments when applicable adopted by the State and other government authorities having jurisdiction shall establish minimum requirements for this project. This project shall comply with the following:
>
> 1.  Uniform Building Code (UBC) [1997 edition]
> 2.  Uniform Building Code Standards (UBCS) [1997 edition]
> 3.  Uniform Fire Code (UFC) [1997 edition]
> 4.  California Building Code [1998 edition]
> 5.  California Code of Regulations.

In his deposition, landscape architect Doug Nelson ("Mr. Nelson") testified that the bid set's regulatory requirements covered the rehabilitation project, including the steps, and that the bid set accurately reflected rehabilitation project requirements. The Loyes explain that the bid set gave potential bidders information for an accurate bid to meet rehabilitation project requirements and to provide a full understanding of the scope of work. Rehabilitation project coordinator Michael Pieper ("Mr. Pieper") testified:

> Q.  So at least in terms of the point at which the bid was put, the representation to bidders was that these regulatory requirements would apply to the contract they were bidding on, right?
> . . .
> A.  This is what they were told, what's written in here, yes.

### Failure To Comply With Building Codes

Mr. Pieper testified that he lacked authority to deviate the steps from building code compliance.

3

1  The Loyes identify only Superintendent Tollefson and accessibility coordinator Larry Harris ("Mr.
2  Harris") as the "two people with that authority." Superintendent Tollefson testified that he did not recall
3  giving anybody permission to build the steps out of building code compliance.  Mr. Harris responded
4  "No" to the question: "Did you ever giver permission for those stairs to be built out of compliance with
5  any building codes?" Mr. Harris testified that he made no determination whether building codes applied
6  to the steps.

7  Mr. Pieper testified that he was primarily responsible to determine building code compliance for
8  the rehabilitation project.  Mr. Pieper further testified: "My job was to insure that the work was
9  completed in compliance with the National Park Service requirements" and to do so, he needed to know
10 NPS requirements for building code compliance.

11 Mr. Nelson testified that "[t]here was an assumption that the codes did not apply" to the steps
12 because the steps were part of the trail and that he relied on NPS personnel to make such determination.

13 Mr. Pieper testified that "[w]e did make an assessment" as to the steps UBC compliance and
14 "they weren't in compliance." Mr. Pieper noted that during construction, Mr. Pieper and Mr. Nelson
15 discussed that the steps did not comply with building codes. Nonetheless, Mr. Nelson testified that he
16 designed the rehabilitation project as to the building codes "[i]n a general way, as these applied, as we
17 believed these applied."

### Absence Of Handrails

19 Mr. Pieper testified that there was discussion to eliminate permissibly handrails for the steps to
20 avoid view obstruction.  Mr. Nelson testified that handrails were omitted "[b]ecause these were
21 considered trail steps and not – not designed with accessibility considerations." Mr. Nelson further
22 testified that during discussions with NPS personnel, "one of the design considerations was . . . minimize
23 vertical elements" to warrant handrail elimination.  Mr. Nelson understood that the steps did not need
24 to comply with accessibility regulations.

### Steps' Rise And Run

26 Mr. Pieper testified that the steps' rise and run were higher and longer than permitted by code.
27 Mr. Pieper further testified that the steps' rise and run decision was made by "a combination" of Mr.
28 Pieper "along with other people in the park and the designers." Mr. Pieper further testified as to the

decision:

> Q. . . . But there was no obstruction or impairment to view caused by the rise and run of the steps, was there?
>
> A. No. But what it would have meant is, these stairs would have had to be carried out further. . . . [I]f we changed the rise and run – say we reduced the rise, we would have to carry the steps out and the ground kept falling. So we'd have to get out here a lot further which means it was more impairment of the view again the further we carried it.

Mr. Pieper further testified that he discussed with Mr. Nelson "[t]hat we were going to have to make the rise enough to make the connection with the existing trail without protruding out so far that it became an obstruction again to the natural terrain and the rip rap."

Mr. Nelson testified that the steps' rise and run was determined by his office without NPS involvement and that NPS did not prohibit an extension of the steps' landing. Mr. Nelson testified that he was unfamiliar with UBC or CBC rise and run requirements for stairs.

### **ADA Accessibility**

The Loyes note that YNP accessibility coordinator Mr. Harris confirmed that NPS policy required compliance with the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-12117. Mr. Harris testified:

> Q. And we've established that the NPS is required to comply with the ADA?
>
> A. Correct.
>
> Q. And we've established that it's not a choice, that they're required to do it, right?
>
> . . .
>
> A. My answer to you is that the policies are the national park policies applying to accessibility rule and standards has been accommodated in the project because they're included in the requirements to the designer to implement them.

Mr. Harris further testified that new design and construction projects are required to comply with accessibility standards and guidelines, which were to apply uniformly to NPS parks. Mr. Harris noted that he lacked discretion to withhold application of ADA laws and standards. Mr. Harris testified: "Once you make that determination that it is and needs to be accessible, then all the codes and regulations, UFAS, ADA and all building codes appropriate to ADA accessibility then applied, regardless. You can't get around them."

1    The Loyes note that stairs meet the definition of "facility" under the ADA Accessibility
2 Guidelines ("ADAAG") and Uniform Federal Accessibility Standards ("UFAS"). The ADAAG define
3 facility as "[a]ll or any portion of buildings, structures, site improvements, complexes, equipment, roads,
4 walks, passageways, parking lots, or other real or personal property located on a site." The UFAS define
5 facility as "[a]ll or any portion of a building, structure or area, including the site on which such building,
6 structure or area is located, wherein specific services are provided or activities performed."

7    The Loyes point out that the ADAAG and UFAS impose minimal requirements for newly
8 constructed facilities, including an "accessible route" to connect accessible spaces and elements of a
9 facility and "handrails on both sides of all stairs." The Loyes conclude that absence of handrails for the
10 rehabilitation project violated the ADAAG and UFAS.

11    The Government points out that accessability coordinator Mr. Harris determined that accessibility
12 guidelines were inapplicable to proposed path alterations because the steps lead to an area that was not
13 designed or created to be accessible by walkway or sidewalk. Mr. Harris testified that "you don't have
14 to have an accessibility path of travel from the landing because you're not going anywhere that's
15 accessible. That includes the steps. The steps are not an accessibility path of travel." Mr. Harris further
16 testified:

> . . . we did not need an accessible path of travel from the upper landing area, down through the work that they were proposing to do on the trail, which included the steps. It didn't require me to do any further investigation because that was my determination.
>
> It didn't require me to look up any codes or regulations specifically, because I believed I was following the requirements of the Director's Order to provide . . . as much accessibility as we possibly can and wherever we can.

21    The Government notes that Mr. Harris evaluated the steps' safety and accessibility and concluded
22 that bringing disabled persons to the graveled and sanded terrain was a safety hazard and that the vista
23 was already accessible from the viewing area for all persons. The Government concludes that NPS did
24 not design the path alterations to comply with the accessibility guidelines which were inapplicable
25 because the trail was not accessible by walkway or sidewalk.

26                          **Plaintiffs' Claims**

27    The complaint alleges that at 4:15 p.m. on May 23, 2009, Ms. Loye walked up the granite steps
28 from the viewing area to the parking lot to depart and fell off the edge of a step onto ornamental boulder-

sized jagged rocks. The complaint alleges Ms. Loye suffered "catastrophic injuries," including blunt force head trauma, anoxic brain injury, cervical spine fractures, seizures, and residual cognitive and neurological disability.

The complaint alleges a (first) negligence; premises liability claim that the area where Ms. Loye was injured constituted a dangerous condition because:

1. The steps "lacked exterior guardrails, handrails, grab bars or other safety features";
2. The Government "incorporated and maintained an unguarded drop-off" onto the boulders;
3. The "steps incorporated an inappropriate, unsafe and confusing rise and run";
4. The "steps were constructed and maintained in violation of applicable building, safety, construction, and engineering codes and industry standards";
5. The Government "failed to remove or protect against injury by the large jagged boulders"; and
6. "[T]here was a failure to comply with the mandatory requirements of NPS Management Policies, 2006, and Director's Order No. 50, as well as other directives and statutes."

The claim alleges that the rehabilitation project violated mandatory NPS and Department of Interior regulations which Government employees lack discretion to violate and including the California Building Code, Uniform Building Code, National Park Services Management Policies, 2006 § 8.2.5.1, National Park Service Director's Order 50, 50B and 50C, and "A Sense of Place: Design Guidelines For Yosemite Valley" (2004). The claim further alleges that the Government "did not act to remedy, warn or eliminate the risk presented to park visitors."

The complaint alleges a (second) loss of consortium claim that Mr. Loye has suffered the loss of Ms. Loye's love and companionship.

The complaint seeks recovery for the Loyes' medical expenses and emotional distress.

## DISCUSSION

### F.R.Civ.P. 12(b)(1) Motion To Dismiss Standards

The Government contends that the discretionary function exception bars invocation of this Court's subject matter jurisdiction.

F.R.Civ.P. 12(b)(1) authorizes a motion to dismiss for lack of subject matter jurisdiction. Fundamentally, federal courts are of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 341 (1994). A "court of the United States may not grant relief absent a constitutional or valid statutory grant of jurisdiction." *U.S. v. Bravo-Diaz*, 312 F.3d 995, 997 (9th Cir. 2002). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F. 2d 1221, 1225 (9th Cir. 1989). Limits on federal jurisdiction must neither be disregarded nor evaded. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396 (1978). "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Communities for Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001).

When addressing an attack on the existence of subject matter jurisdiction, a court "is not restricted to the face of the pleadings." *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988). In such a case, a court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 541 (1989); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983); *Smith v. Rossotte*, 250 F.Supp.2d 1266, 1268 (D. Or. 2003) (a court "may consider evidence outside the pleadings to resolve factual disputes apart from the pleadings").

No presumptive truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts does not preclude evaluation of the merits of jurisdictional claims. *Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). On a factual attack of a complaint with affidavits or other evidence, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High School*, 343 F.3d 1036, 1040, n. 2 (9th Cir. 2003).

When a court considers "items outside the pleading" on a F.R.Civ.P. 12(b)(1) motion, the court resolves "all disputes of fact in favor of the non-movant." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996). The Ninth Circuit Court of Appeals explains that "where the district court has properly considered items outside the complaint in considering a motion to dismiss, the standard we apply upon

de novo review of the record is similar to the summary judgment standard that the district court purported to apply."

With these standards in mind, this Court turns to the Government's challenges to subject matter jurisdiction.

### **FTCA's Discretionary Function Exception**

The Loyes seek to invoke this Court's subject matter jurisdiction under the FTCA to pursue their claims.

The FTCA is a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971 (1976). The FTCA waives the federal government's sovereign immunity when its employees are negligent within the scope of their employment. *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995).

FTCA's immunity waiver is limited by the discretionary function exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties." *Faber*, 56 F.3d at 1124. "The purpose of the discretionary function exception is to protect the ability of the government to proceed with decisionmaking in carrying out its unique and vital functions without 'second-guessing' by the courts as to the appropriateness of its policy choices." H.R. Rep. No. 1015, 101st Cong. 2nd. Sess. 134 (1991).

The Government "bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity" because such an exception "is analogous to an affirmative defense" to correctly place the burden on "the party which benefits from the defense." *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). "Although the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, 'the United States bears the ultimate burden of proving the applicability of the discretionary function exception.'" *Faber*, 56 F.3d at 1124 (quoting *Prescott*, 973 F.2d at 701-702).

**Two-Step Analysis**

The United States Supreme Court has articulated and refined a two-part test to determine whether a claim is subject to the discretionary function exception. *See United States v. Gaubert*, 499 U.S. 315, 322, 325, 111 S.Ct. 1267, 1273, 1275 (1991); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958 (1988); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 820, 104 S.Ct. 2755, 2764, 2768 (1984); *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968 (1953). The first step requires determination whether any "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1273 (citing *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958). If so, the discretionary function exception does not apply because there is no element of judgment or choice in the complained of conduct. *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1273. In the absence of an element of judgment or choice, "the inquiry is at an end." *Blackburn*, 100 F.3d at 1429. Discretion is removed "under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors." *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018, 1026 (9th Cir. 1989). Nonetheless, a general regulation or policy "does not remove discretion unless it specifically prescribes a course of conduct." *Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001).

To determine whether the complained of conduct was grounded in judgment or choice, the crucial first step is to determine exactly what conduct is at issue. *Autery v. United States*, 992 F.2d 1523, 1527-1528 (11th Cir. 1993), *cert. denied*, 511 U.S. 1081, 114 S.Ct. 1829 (1994). "The nature of the conduct involved governs whether the so-called discretionary function exception applies." *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir. 1986). Negligence "is irrelevant to our inquiry at this point. Governing administrative policy, not the [defendant's] knowledge of danger, determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Autery*, 992 F.2d at 1527-1528.

If an element of choice or judgment is involved, the second step of the analysis is invoked to determine whether the challenged discretionary acts "are of the nature and quality that Congress intended to shield from tort liability." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. Decisions that require choice are exempt from suit under the FTCA if they are "susceptible to policy judgment" and involve

an exercise of "political, social, [or] economic judgment." *Gaubert*, 499 U.S. at 325, 111 S.Ct. at 1275; *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2768. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 624, 111 S.Ct. 1267. Where there is room for policy judgment and decision, there is discretion of the sort protected by 28 U.S.C. § 2680(a). *Dalehite*, 346 U.S. at 36, 73 S.Ct. at 968. "'[I]f judicial review would encroach upon this type of balancing done by an agency, then the exception would apply.'" *Chamberlin v. Isen*, 779 F.2d 522, 523 (9th Cir. 1985) (quoting *Begay v. United States*, 768 F.2d 1059, 1064 (9th Cir. 1985)).

Moreover, "[t]he challenged decision need not be actually grounded in policy considerations." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). The discretionary function exception applies "[e]ven if the decision is an abuse of the discretion granted." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008).

## Steps Design And Construction

### *Mandatory Course Of Action*

The Government argues that "there are no federal statutes, regulations, or policies that created a clear duty to which the NPS had to adhere in designing, constructing, and maintaining the steps at Olmsted Point." The Loyes accuse Mr. Pieper of failing to implement an NPS policy to require "the stairs to comply with applicable building codes."

The Government faults the Loyes' reliance on the NPS' 2006 Management Policies ("Management Policies") and points to the Management Policies' section 8.2.5.1 which provides in part:

> These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs . . . or install guardrails . . . . Some forms of visitor safeguards typically found in other public venues – such as fences, railings, and paved walking surfaces – may not be appropriate or practicable in a national park setting.

The Government contends that the Management Policies fail to establish a "specifically prescribed federal policy" to address the design or construction of the Olmsted Point steps.

The Government challenges the Loyes' reliance on Director's Orders 50, 50B, 50C, 58 and 83

in that Director's Orders "are guidelines setting forth the goal of visitor safety at national parks, not specific mandates to that end." *See Terbush*, 516 F.3d at 1137 ("Reading through the document [NPS-50], one is hard pressed to find any mandatory requirements applicable here. That discovery should be no surprise in light of the document's intended role as a policy guideline."); *Blackburn*, 100 F.3d at 1431 ("Although the policy manuals [NPS 50 and others] outline general policy goals regarding visitor safety, they do not set out the specific means by which the NPS employees are to meet these general goals.") The Government concludes that the Director's Orders fail to preclude application of the discretionary function exception.

The Government further faults the Loyes' reliance on Director's Order 42, the Uniform Building Code, and the California Building Code in that they provide no mandates to install handrails for the Olmsted Point steps or to utilize a particular rise and run for the steps. The Government notes that the Uniform Building Code applies to buildings, not projects such as the Olmsted Point steps. The Government continues that application of the California Building Code would violate the U.S. Constitution's Supremacy Clause "by constituting a direct and intrusive regulation by the State of the Federal Government's operation of its property at Yosemite" and "would do violence to the main purposes and objectives underlying the National Park System: visitor enjoyment and resource protection." *Blackburn*, 100 F.3d at 1435.

The Government challenges the Loyes' reference to "A Sense of Place Design Guidelines for Yosemite Valley" given that the document notes: "The guidelines should be aides to decision-making rather than prescriptions or formulas." The Government concludes that absence of a mandatory course of action prong of the discretionary function exception is met in that NPS' "design decisions require balancing resource preservation with public access."

The Loyes fail to challenge directly the Government's points regarding Management Policies, Director's Orders, and "A Sense of Place Design Guidelines for Yosemite Valley." Rather, the Loyes rely on the bid set's reference to codes and regulations as an NPS policy that the rehabilitation project "would comply with specified building codes" which Superintendent Tollefson instituted. The Loyes characterizes "Mr. Pieper's job [as] merely to implement the decision made by" Superintendent Tollefson. The Loyes point to Mr. Pieper's acknowledgment that he "permitted the stairs to be built out

of code" although he had "no rightful option but to adhere" to Superintendent Tollefson' directive. The Loyes conclude that Mr. Pieper's conduct "in permitting the stairs to deviate from applicable building codes could not 'appropriately be the product of judgment or choice'" to preclude the discretionary exception.

The Government responds that the bid set "required the YNP to exercise its discretion to determine the extent to which the codes listed in Part 1.14, if any, should be applicable to the trail connection steps" and "do not specify which of the codes listed in Part 1.14 are applicable to which aspects of the Rehabilitation Project." The Government characterizes the bid set as "subject to interpretation." An "engineering standard" must be "'embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the government actors' before we can conclude that failure to satisfy such a standard is a non-discretionary act." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1177 (9th Cir. 2002) (quoting *Kennewick Irrigation*, 880 F.2d at 1026). The Government further points to Mr. Nelson's testimony that codes did not apply to the steps because they are part of the trail.

The Loyes fail to demonstrate that the bid set and its reference to codes and regulations constitute a prescribed course of action which precludes the discretionary function exception. The bid set does not constitute a federal statute, regulation or policy. The Loyes emphasize NPS alleged wrongdoing rather than isolate a directive which eliminates discretion. The Loyes' failure to pinpoint a requisite directive dooms their challenge to the discretionary function exception.

In addition, the Government notes that NPS considered accessibility during the Olmsted Point steps' design process and concluded that handrails were unnecessary since the steps are the start of the trail which is beyond an accessible area. The Government explains that the Olmsted Point parking lot and viewing area were designed with accessibility guidelines but the trail connection steps separated these accessible areas and were part of the inaccessible trail segment and wilderness area. The Government points out that since there is no regulation that a trail connection is a "program" under the Rehabilitation Act, 29 U.S.C. §§ 701, et seq., accessibility coordinator Mr. Harris "considered aesthetics, safety, the terrain and other factors in assessing whether accessibility guidelines applied."

The Loyes respond that rehabilitation project "documents" incorporate the "policy decision that

13

new construction, including the subject stairs, were required to comply with accessibility standards . . . embodied in the ADAAG and UFAS." The Loyes contend that the ADAAG and UFAS require handrails even if the stairs lead to an inaccessible path.

The Loyes fail to demonstrate that the ADAAG and UFAS apply to the rehabilitation project, which address national park areas clearly rendered inaccessible under ADA standards. The steps lead to hiking trials beyond the purview of the ADA and accessibility considerations. The Loyes fail to substantiate that the rehabilitation project constitutes a site to which the ADAAG and UFAS apply. The Loyes fail to overcome the discretionary function exception in the absence of an applicable directive requiring handrails.

### *Policy Judgment*

The Government argues that the policy judgment prong of the discretionary function exception is met in that in rehabilitating the Olmsted Point, NPS followed goals of the 1916 Organic Act, 16 U.S.C. §§ 1, et seq., to preserve the "scenery and natural and historic objections" to "leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. The Government argues that no accessibility guidelines were invoked for the Olmsted Point steps due to safety concerns and absence of the trail's end point or destination to limit access for disabled persons.

The Government contends that the design decision of the Olmsted Point steps "balanced the goals of maintaining the view in its natural setting, including trail connection steps consistent with the granite surroundings, and visitor access and safety." The Government argues that the decision to omit handrails balanced "visitor safety with preservation of the aesthetic beauty of a national park." The Government further argues that the steps' "rise and run" were designed to conform and blend with and not obstruct the existing natural terrain. The Government further points to the steps' design difficulties arising from the terrain's "naturally dropping off on a slope." The Government notes that NPS balanced considerations and concluded that the trail connection steps "were safely designed."

The Loyes offer nothing meaningful to challenge the policy judgment prong of the discretionary function exception. The Government demonstrates room for policy judgment and decision to design and construct the rehabilitation project to enhance YNP aesthetics, in particular, sight lines to avoid view obstruction. The record reveals that the rehabilitation project sought to preserve scenery and in turn

1 promote NPS policy.

**Failure To Warn**

The Government contends that the discretionary function exception bars the Loyes' failure to warn claims.

"The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion." *Terbush*, 516 F.3d at 1137. The Management Policies' "broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards." *Blackburn*, 100 F.3d at 1431.

The Government faults the Loyes' inability to identify "a specific mandate for warnings" for the Olmsted Point steps and to "overcome the legal precedent that public policy considerations are involved in balancing access to, and preservation of natural resources, with warning of potential hazards." The Government argues that discretionary decisions arise with hazard identification and warning, including the nature of warning, to subject a failure to warn claim to the discretionary function exception. Warning decisions "are policy-based" to require NPS "to balance access with safety, and take into account conservation and resources in designing area plans and making individual trail determinations." *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994), *cert. denied*, 514 U.S. 1095, 115 S.Ct. 1821 (1995).

The Loyes offer nothing to challenge the Government's failure to warn arguments. This Court agrees with the Government that the "entire process" surrounding warnings involves discretion to invoke the discretionary function exception.

**Loss Of Consortium**

The Government argues that Mr. Loye's loss of consortium claim is "derivative" of and fails with Ms. Loye's claims.

A "common law rule has arisen, granting either spouse the right to recover for loss of consortium caused by negligent injury to the other spouse." *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 393, 525 P.2d 669 (1974). "[I]n California each spouse has a cause of action for loss of consortium .

. . caused by a negligent or intentional injury to the other spouse by a third party." *Rodriguez*, 12 Cal.3d at 409, 525 P.2d 669. Loss of consortium requires the allegedly injured spouse to have a viable claim. "Since he [plaintiff] has no cause of action in tort his spouse has no cause of action for loss of consortium." *Blain v. Doctor's Co.*, 222 Cal.App.3d 1048, 1067, 272 Cal.Rptr. 250 (1990).

Mr. Loye's loss of consortium claim fails with application of the discretionary function exception, which bars Ms. Loye's claims.

**CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1. DISMISSES with prejudice the Loyes' claims;
2. DIRECTS the clerk to enter judgment in favor of defendant United States of America and against plaintiffs Susan Loye and Kenneth Loye; and
3. VACATES the February 14, 2012 pretrial conference and March 26, 2012 trial.

IT IS SO ORDERED.

**Dated:   October 12, 2011**              /s/ Lawrence J. O'Neill
                                       UNITED STATES DISTRICT JUDGE